IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHUNG K. SHIH,<br><br>*Defendant*. | Criminal No. 1:26-cr-96<br><br>The Honorable Michael S. Nachmanoff<br><br>Sentencing: September 3, 2026 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, by and through its attorney, Robert J. McManigal, hereby submits its position with respect to the sentencing of defendant Chung K. Shih ("Shih").

The underlying loan fraud scheme here does not happen without Shih. He was integral to its execution – he prepared four separate loan applications, once the applications were signed by his co-conspirator Teresita Tiongson ("Tiongson"), he submitted them for processing, and later he made follow-up phone calls with administering financial institutions and the Small Business Administration ("SBA") to facilitate the loan process. When the loans were funded, Shih took his share - $322,894.54 – which he spent on personal expenses. Shih has since pled guilty. That matters, but it does not undo his role in getting four fraudulent applications funded.

For these reasons, the United States respectfully asks this Court to impose a jail sentence within the guideline range, 27 – 33 months, a term that already accounts for Shih accepting responsibility for his conduct. A sentence within the guideline range is "sufficient but not greater than necessary," to comply with the purposes of federal sentencing. 18 U.S.C. § 3553(a).

## I. FACTUAL BACKGROUND

1. The Paycheck Protection Program and Economic Injury Disaster Loans

The early months of the COVID-19 pandemic were marked by a serious public health crisis, and by significant financial disruption. Many Americans lost their jobs as businesses closed and state and local governments issued stay-at-home orders. In response, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), in March 2020. The CARES Act made billions of dollars in government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loans ("EIDL") program.

PPP loans were forgivable in full if the proceeds were used on a narrow set of qualifying expenses intended to help struggling businesses survive, including payroll, interest on mortgages, rent, and utilities. Loan proceeds could not be used for the borrower's personal living expenses. The SBA administered the program, and applicants were required to meet specific eligibility criteria designed to ensure the funds were used to prevent layoffs and support businesses genuinely affected by the pandemic.

Additionally, the SBA administered the EIDL program. EIDL provided loans to businesses that suffered substantial economic injury because of the COVID-19 disaster and needed working capital to survive. To qualify, applicants were required to provide basic information about their business, including gross revenues, cost of goods, and number of employees.

Both programs were created to meet the same challenge, and both programs shared a common process. Business owners completed an application stating their business was open, operational, and had a certain number of employees and expenses. Then, the owner certified the truthfulness of that information. It was simple and straightforward. And because of that simplicity, the programs became prime targets for fraud.

Tiongson and Shih understood the process and took advantage of it for their own personal gain.

2. Offense Conduct

*a. The First PPP Loan*

On May 4, 2020, Shih prepared a PPP loan application for AHR. ECF No. 12, Presentence Investigation Report ("PSR") ¶ 22. The application Shih prepared falsely stated that AHR had 25 employees and an average monthly payroll of $22,000. *Id.* At the time, AHR's operations had already wound down, and neither the employees nor payroll existed. *Id.* Tiongson certified the accuracy of the application and represented that the loan proceeds would be used for qualifying expenses, such as payroll, rent, utilities, and mortgage payments. *Id.* Shih ultimately submitted the application on AHR's behalf. *Id.*

After submitting the application, Shih called the financial institution processing the application to facilitate the loan being funded. PSR ¶ 24. During the call, Shih impersonated Tiongson, tell the financial institution's personnel that he was Tiongson, and falsely verifying her identity with her address and last four digits of her Social Security number. *Id*.

On May 7, 2020, the loan was funded in the full amount requested - $57,143.00. PSR ¶ 25. Bank records show that Shih and Tiongson divided the proceeds between themselves and used the funds for personal expenses rather than the purposes certified in the application. *Id.*

*b. The First EIDL Loan*

Four months later, on September 28, 2020, Shih, with Tiongson's knowledge, filed a fraudulent EIDL application seeking $150,000 with the SBA on behalf of AHR, representing that the business was operating. PSR ¶ 26. Tiongson signed the application, certifying that the information provided was true and that the loan proceeds would be used for working capital. *Id.*

To facilitate the processing, Shih and Tiongson contacted the SBA directly to push the application through. PSR ¶ 28.

A short time later, the loan was funded in the amount of $149,900. PSR ¶ 29. Bank records show Shih and Tiongson again divided the funds between them and used the proceeds for personal expenses. *Id*.

*c. The Second PPP Loan*

On April 21, 2021, Shih prepared and submitted a second PPP Loan application in the amount of $75,616.00, on behalf of AHR. PSR ¶ 30. The application again misrepresented the status of the business and claimed non-existent AHR employees. *Id.* Tiongson certified the information as accurate and represented the proceeds would be used for qualified expenses. *Id.* The loan was fully funded, and the proceeds were again divided between Shih and Tiongson and used for personal purposes. PSR ¶ 32.

*d. The Second EIDL Loan*

On July 13, 2021, Shih and Tiongson submitted a second false EIDL application, seeking $350,000.00 – by itself, more than double the amount sought in any of the three prior applications and greater than the combined total of all three. PSR ¶ 33. Tiongson again certified that the information provided was accurate and that the proceeds would be used for working capital. *Id.* As with the prior EIDL application, Tiongson and Shih contacted the SBA to facilitate processing. PSR ¶ 35.

The loan was funded the following week. PSR ¶ 36. Bank records again show the proceeds divided between the defendants, with Shih using his for personal use. *Id.*

Across the four applications, Shih and Tiongson obtained $632,659.00 in fraudulently procured CARES Act relief funds. PSR ¶ 37. Of that amount, Shih personally received

$322,894.54. PSR ¶ 38.

## II. GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *see also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the [18 U.S.C.] § 3553(a) factors" in determining the appropriate sentence. *Id.* at 49–50; *see also Clark*, 434 F.3d at 685. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

### 1. <u>The Base Offense Level and Loss Amount</u>

The base offense level is not in contention. As agreed in the plea agreement, the base offense level is 7. The actual loss amount was $632,659.00. *See* ECF No. 6, Plea Agreement pg. 6. As such, a 14-level enhancement for the loss amount is proper under U.S.S.G. § 2B1.1(b)(1)(H). This loss amount was stipulated by the parties and is not in dispute.

### 2. <u>Acceptance of Responsibility</u>

The United States concurs with the Probation Officer's application of the reductions for acceptance of responsibility. If the Court grants the adjustment, Shih's final offense level will be reduced by three points, respectively. U.S.S.G. §§ 3E1.1(a), 3E1.1(b). Bringing his total offense level to 18.

3. Criminal History Category

Shih has a criminal history stemming from prior arrests. The first was in 2006 for obtaining money by false pretenses in Loudon County, VA. PSR ¶ 60. The second was in 2013 for identity theft in Fairfax County, Virginia. PSR ¶ 61. Accordingly, the defendant has a criminal history category of 1. PSR ¶ 117.

## III. IMPOSITION OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

1. Nature, Circumstances and Seriousness of Offense

The nature of this offense is straightforward, and its seriousness should not be understated. Tiongson and Shih stole hundreds of thousands of dollars in CARES Act funds designed to maintain the country's economic stability during a declared emergency. This Court has already described this conduct as a terrible exploitation of the circumstances presented by COVID-19, and Shih's role in this scheme fits that description.

Shih's conduct here raises a distinct concern that goes past the loss amount. Shih had no ownership in AHR. He was not on any of AHR's operating documents or corporate records. He was not responsible for meeting payroll or for the employees on the payroll. Nonetheless, Shih created false loan applications on behalf of AHR, he fabricated AHR's payroll records to support those applications, and then impersonated Tiongson to facilitate the loan for funding. What makes this conduct particularly troubling is that the entire time he is doing this, Shih remains largely concealed from the fraud. If the scheme is detected, it's Tiongson's name on the applications and certifications, it is Tiongson's business that authority's flag. Tiongson assumed the exposure, Shih assumed the reward. It is hard to conceive that this arrangement was coincidence. It appears far more likely that it was by Shih's design. And because of this, it is troubling that Shih used a vulnerable, elderly woman to insulate himself from criminal exposure.

There is a tendency when fraud is committed against the government to believe there is no victim. Perhaps that is because government coffers appear bottomless, and the funds that flow through the coffers come from millions of taxpayers, as opposed to a single, relatable everyday victim. But that belief collapses under the weight of a single number - $632,659.00. That is not an abstract harm. It is a dollar figure, and every one of those fraudulent dollars that Tiongson and Shih received is a dollar that did not go to a real business, employing real people, that was struggling. It is also hundreds of thousands of dollars of taxpayer money that will not be recovered, at least not in the form it was intended.

The seriousness of the crime also cannot be measured in just dollars. Loan programs under the CARES Act functioned because the government trusted applicants to tell the truth in exchange for speed. Fraud such as this is precisely what erodes trust and invites more restrictive lending processes during the next national crisis.

2. History and Characteristics of the Defendant

Throughout his life, Shih has had the foundation and support system in place to help him succeed. He was born and raised in Northern Virginia, surrounded by his parents, grandparents, and other members of his extended family who provided him encouragement and support. PSR ¶¶ 79-89. Many people, especially those who enter the criminal justice system, do not have this type of foundation. He also, by every indication, is able-bodied and capable of working. PSR ¶¶ 90-92. Nothing has prevented Shih from supporting himself the way millions of other Americans support themselves – through hard, honest work. Shih did not lack the capacity for honest work, just the willingness.

To the extent Shih's substance abuse and other health issues possibly impacted his decision-making, these are not an excuse for his conduct. Those issues did not preclude Shih from deliberately preparing four false applications, submitting those false applications, and then, following up with lending officials to ensure the fraudulent loans were funded. That is not conduct of someone who, due to their addiction, is acting impulsively without regard of consequence. Rather it is the conduct of someone who calculating in their execution of a scheme to defraud.

3. General Deterrence, Just Punishment

Like his co-conspirator, a sentence imposed in this case must speak more to just Shih. It must speak to other small business owners tempted to misrepresent their business on federal loan applications and decided against it. The sentence must also speak to everybody else who is deciding whether fraud against the government carries real consequences.

The law requires the Court to consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences.

If either is eliminated or minimized, the deterrent effect is proportionally minimized."). Courts have long recognized that general deterrence carries weight in fraud cases because, unlike crimes of passion, fraud is a crime of calculation. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). Fraud requires planning, patience, and the willingness to lie. Because of this, courts have likewise recognized that fraud offenses are inherently difficult to detect. *Id.* This difficulty alone can justify a higher sentence because a defendant's odds of getting away with their crime is greater than other criminal acts. *See Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) (noting that crimes that are "significantly more difficult to detect may warrant substantially higher penalties"). That reasoning applies here for Shih, the person responsible for structuring his role and designing the fraud to receive the benefit, while avoiding the exposure Tiongson carried.

4. Restitution & Forfeiture

The Government requests that the Court impose restitution. In the plea agreement, the defendant agreed to pay restitution. *See* Plea Agreement at pg. 6. The parties agree that he owes $632,659 in restitution to the Small Business Administration. At sentencing, the Government will submit a proposed order for the Court's consideration.

With regard to forfeiture, in the plea agreement, the defendant agreed that the money judgment would be at least $322,894.54. *See* Plea Agreement at pg. 7. At sentencing, or prior to sentencing, the Government will submit a separate order relating to the money judgment and the forfeiture of real property.

## CONCLUSION

For the reasons stated above, the United States submits that a term of imprisonment within

the guideline range of **27-33 months** is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

TODD W. BLANCHE
ATTORNEY GENERAL

Date: August 27, 2026

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

By: /s/

Robert J. McManigal
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
robert.mcmanigal@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on August 27, 2026, I filed the foregoing document with the Clerk of Court. I further certify that on this same date, I emailed a copy of the foregoing to counsel for the defendant and to the United States Probation Officer assigned to this matter:

Teneisha L. Smith
United States Probation Officer
401 Courthouse Square, 3rd Floor
Alexandria, Virginia 22314
Teneisha_Smith@vaep.uscourts.gov

By: /s/

Robert J. McManigal
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Robert.mcmanigal@usdoj.gov